# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **CATHERINE ARMBRESTER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:05-CV-2458-RDP** |
| | } | |
| **TALLADEGA CITY BOARD OF EDUCATION,** | } | |
| | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

The court has before it the April 30, 2007 motion (Doc. # 34) of Defendant Talladega City Board of Education ("the Board") for summary judgment.  Pursuant to the court's orders of December 13, 2006 (Doc. # 26) and April 23, 2007, the motion for summary judgment is now under submission and will be considered without oral argument.

Having carefully considered the briefs and evidentiary submissions, the court finds that the Board's motion for summary judgment is due to be granted in its entirety for the reasons outlined below.

## I.      <u>Procedural History</u>

Plaintiff Catherine Armbrester commenced this action on November 29, 2005 by filing a complaint (Doc. # 1) in this court, generally alleging violations of 42 U.S.C. §§ 1981 and 1983,  42 U.S.C. § 12111 *et seq.* (the Americans with Disabilities Act), 29 U.S.C. §§ 794 and 794a (the Vocational Rehabilitation Act), 42 U.S.C. § 2000e *et seq.* (Title VII), and 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act).  After a telephone conference call with the court on April 18, 2006, Plaintiff filed a first amended complaint (Doc. # 19) alleging that the Board subjected her to:

disparate treatment because of her race under Title VII (Count One); race discrimination under §§ 1981 and 1983 (Count Two); disability discrimination under the Americans with Disabilities Act ("ADA") (Count Three); age discrimination under the Age Discrimination in Employment Act ("ADEA") (Count Four); discrimination because of a physical impairment under the Rehabilitation Act (Count Five); and retaliation under Title VII, § 1981, the ADA, and the ADEA (Count Six).

Defendant's April 30, 2007 Motion for Summary Judgment (Doc. # 34) asserts that no genuine issue of material fact exists and that the Board is entitled to judgment as a matter of law as to all claims asserted against it.

The parties have each filed briefs and submitted evidence in support of their respective positions concerning the pending motion for summary judgment. On April 30, 2007, the Board submitted evidence[1] (Doc. # 37) in support of the motion and also filed a supporting memorandum brief[2] (Doc. # 38). Plaintiff submitted evidence[3] (Doc. # 40) in opposition to the motion for summary judgment on May 21, 2007 and on the same date filed an opposing brief (Doc. # 39).

---

[1] The Board submitted the following: the deposition of Catherine Armbrester, volumes I and II (Exhibit 1); the deposition of Leonard "Lee" Messer (Exhibit 2); the deposition of James Kenneth "Ken" Shirley (Exhibit 3); the affidavit of Leonard "Lee" Messer with exhibits A-F (Exhibit 4); the affidavit of James Kenneth Shirley with exhibit A (Exhibit 5); the Brookwood Medical Center surgical report for Catherine Armbrester (Exhibit 6); excerpts from termination hearing transcript pages 466-67 (Exhibit 7); and excerpts from termination hearing transcript pages 698-99 (Exhibit 8).

[2] With its first submission, the Board inadvertently filed only the portion of its brief containing the first page of the table of contents. (*See* Docs. # 36, 38). By court order dated May 1, 2007, the court allowed the Board to substitute the complete brief for the incomplete brief.

[3] Plaintiff submitted in support of the opposition to summary judgment: the deposition transcript of Catherine Armbrester, including exhibits (Exhibit A); the hearing transcript from October 10, 2005 (Exhibit B); the deposition transcript of James Kenneth Shirley, including exhibits (Exhibit C); and the deposition transcript of Leonard Messer, including exhibits (Exhibit D).

Finally, on May 31, 2007, the Board filed a reply (Doc. # 41) to Plaintiff's response in opposition to Defendant's motion for summary judgment.

II.   **Legal Standards for Evaluating a Summary Judgment Motion**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *See id.* at 323.  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d

at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial.  *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on

the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). The court is aware that the summary judgment rule applies in job discrimination cases just as in other cases. *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000) (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

## III.   Relevant Undisputed Facts[4]

### A.   Introduction and Management Structure

Plaintiff, Catherine Armbrester, a black female, began working for the Board in December 1985 as a bus driver. (Armbrester Dep. at 23). Beginning in 1997 and at all relevant times thereafter, Ken Shirley, a white male, was the Supervisor of Maintenance and Transportation for the Board and, in that capacity, the immediate supervisor for all Board bus drivers including Armbrester. (Shirley Aff. at ¶¶ 3, 4; Armbrester Dep. at 71). Shirley and Armbrester had a collegial working relationship and Shirley considered Armbrester to be a good bus driver.[5] (Shirley Aff. at ¶ 4). However, Armbrester did not have a similarly collegial working relationship with Shirley's assistant supervisor, black female Wanda Cochran. (Shirley Aff. at ¶ 3; Armbrester Dep. at 25). Armbrester and Cochran have a history of discord that began almost immediately upon Cochran's employment with the Board in 1998. (Shirley Aff. at ¶ 3; Armbrester Dep. at 25, 43, 49, 134).

---

[4] If the facts are in dispute, they are stated in the manner most favorable to Plaintiff. *Fitzpatrick*, 2 F.3d at 1115.

[5] In fact, Armbrester has never received a speeding ticket or been in a vehicular accident while driving a school bus. (Hearing Transcript from October 10, 2005 at 52-53).

**B.      Initial Complaints Regarding Armbrester's Behavior and Work Performance**

Prior to 2004, Armbrester's almost twenty-year employment with the Board was relatively

uneventful.  She had never been cited for violations of any school rule, policy, or procedure.  (Exh.

F to Messer Aff. at 27).  Complaints about Armbrester and her job performance began in early 2004

and ultimately culminated in the recommendation of the termination of her employment in October

2005.

**1.      The February 2004 Incidents and Complaints**

On February 9, 2004 Armbrester and another black female bus driver, Lillian Higgins, were

involved in an altercation off school grounds.  (Exh. 12 to Armbrester Dep.; Armbrester Dep. at 128-

29).  Although the circumstances precipitating the event have not been described, Armbrester says

that Higgins pulled a gun on her and her granddaughter on the square in Talladega, which is close

to the school premises.  (Armbrester Dep. at 129-30).  After pulling the gun, Higgins then reportedly

called Cochran to the scene, who arrived at the square with another city employee in a city vehicle.

(Armbrester Dep. at 130-31).

The next day, Armbrester received a letter from Superintendent Leonard Messer ("Messer")

recounting the incident.

> On February 9, 2004 after leaving the bus garage, you were involved
> in an altercation which required the intervention of the Talladega
> Police Department.  This incident occurred off of school grounds and
> involved other school employees or their family members.
>
> Under no circumstance should this incident continue over to school
> grounds or bus operations.  This type of behavior poses a serious
> threat for our students and other employees.
>
> Should such hostile or combative behavior occur on school grounds
> or school buses then I will take immediate and strict action.

6

(Exh. 12 to Armbrester Dep.).  The letter was placed in Armbrester's personnel file.

Just a few days later, on or about February 10, 2004, Messer received a specific complaint that Armbrester had pulled her bus out of line and passed around a parked bus that was loading children.  (Messer Aff. at ¶ 5).  Because Armbrester generally denied the allegation which Messer considered to be a serious offense, Messer put out a memorandum to "all bus drivers," cautioning them to adhere to state law and Board policy when loading and unloading children.  (Exh. A to Messer Aff.; Messer Aff. at ¶ 5).  The same memorandum reminded drivers that the safety of students is "our first and highest priority."  (Exh. A to Messer Aff.).

### 2.    The April and May 2004 Incidents and Complaints

The complaints regarding Armbrester's work performance continued into the spring months of 2004.  On April 29, 2004, Higgins reported to Messer that Armbrester operated her bus in such a manner that it crossed the yellow center road line on approach toward the school bus being driven by Higgins.  (Messer Aff. at ¶ 6).  Higgins reported that she was in fear that the two buses would collide.  (Messer Aff. at ¶ 6).  Indeed, students riding on Higgins' bus on April 29 corroborated Higgins' version of events.  (Messer Aff. at ¶ 6).

After receiving the corroboration from student passengers, Messer called a May 11, 2004 meeting with Armbrester and her union representative Amy Marlowe.  (Messer Aff. at ¶ 6).  The meeting was well-timed, as that very morning Messer received another complaint regarding Armbrester's driving from an employee of the Alabama Institute for Deaf and Blind.  (Messer Aff. at ¶¶ 6-8).  The crux of that complaint was that, when stopped at a red light, Armbrester left the rear of her bus on railroad tracks.  (Messer Aff. at ¶ 7).

Messer and Armbrester discussed those two specific incidents.  They also discussed additional complaints from parents and co-workers.  Specifically, Armbrester was informed that parents had telephoned Messer to complain that Armbrester would drive off and leave students who were approaching the bus, but would wait for her own grandchildren at the pickup point.  (Messer Aff. at ¶ 8).  Messer also informed Armbrester that other bus drivers had reported to him that when the buses were lined up in the afternoon ready to pull off, Armbrester, as first in line, would sometimes stay parked for several minutes, causing all of the buses to be delayed.  (Messer Aff. at ¶ 8).  Finally, Messer relayed to Armbrester reports that he had received from some co-workers who felt they were being harassed or stalked because Armbrester followed them, both on campus and off, taking pictures.  (Messer Aff. at ¶ 8).

During the course of the meeting, Armbrester generally denied that any of the incidents actually occurred and complained that other bus drivers were engaging in some of the activities that had been attributed to her.  (Messer Aff. at ¶¶ 6, 9; Armbrester Dep. at 233, 234).  Armbrester admitted that she carried a video and audio tape recorder everywhere she went and that she often carried a 35-millimeter still camera to record co-workers who she believed were violating the same rules for which she was being reprimanded.  (Armbrester Dep. at 123-25; Exh. 1 to Armbrester Dep. at 1).

In concluding the meeting, Messer informed Armbrester that several of the complaints lodged against her could constitute dismissal offenses if it could be proved that they had in fact occurred.  (Messer Aff. at ¶ 9).  Amy Marlowe, Armbrester's union representative at the meeting, also advised Armbrester that it only took one time of not following safety laws for termination to occur.  (Messer

8

Aff. at ¶ 9).  Messer memorialized the May 2004 meeting by memorandum dated May 19, 2004. (Exh. 2 to Armbrester Dep.).

### 3.   Incidents of October Through December 2004 and the Recommendation that Armbrester's Employment with the Board be Suspended

In October 2004, Armbrester complained that Cochran was undermining her by talking about her behind her back to other Board employees.  (Exh. 1 to Armbrester Dep. at 1-2; Armbrester Dep. at 40-41).  Armbrester recounted one specific comment and attributed it to Cochran – "I needed to carry my old gray self home and sit down."  (Armbrester Dep. at 38).  The complaint and the marked personality conflict between the two women led Shirley to advise Armbrester to cease communication with Cochran and to call him directly if she had any questions or concerns.  (Exh. 1 to Armbrester Dep. at 6).

Despite Shirley's warning that the two rivals should cease communication, Cochran continued to carry out her responsibilities as assistant supervisor.  On December 1, 2004, Cochran wrote a letter to Armbrester warning her that "you drove your bus through the main parking lot at a high rate of speed."  (Exh. 9 to Armbrester Dep.).  Armbrester was to consider the letter "a reprimand for your actions.  Should this happen again, more serious actions may be taken against you."  (Exh. 9 to Armbrester Dep.).

Eight days later, on December 9, 2004, when driving her bus filled with children, Armbrester came upon substitute driver Willie Jemison's bus stalled by the railroad tracks.  (Exh. 10 to Armbrester Dep.; Exh. 1 to Armbrester Dep. at 2-3).  Armbrester called Cochran to inquire about the situation and was informed that assistance was on the way.  (Exh. 10 to Armbrester Dep.; Exh. 1 to Armbrester Dep. at 2-3).  Cochran did not instruct Armbrester to allow the students from the

stalled bus to board Armbrester's bus, and Armbrester continued along her route without rendering assistance to the children.  (Exh. 10 to Armbrester Dep.; Exh. 1 to Armbrester Dep. at 7-8).

The same day, Armbrester picked up her student passengers at least a half an hour before school had been dismissed for the day in order to accommodate her personal schedule.  (Shirley Aff. at ¶ 13; Messer Aff. at ¶ 23).  Although Armbrester had called the school principal to arrange for this early pick-up, she failed to clear the appropriate leave time through her supervisor or assistant supervisor.  (Exh. 1 to Armbrester Dep. at 3-4).  Clearing the leave time in advance would have allowed the Board to obtain a substitute driver so that the students would not have been required to leave school early.  (Shirley Aff. at ¶ 13; Messer Aff. at ¶ 23).

By letter hand delivered to Armbrester on January 4, 2005, Messer informed Armbrester that he would recommend to the Board that she be suspended for a period of five days without pay.  (Exh. 11 to Armbrester Dep.).  Messer cited the following grounds for such a suspension: (1) driving at a high rate of speed; (2) harassing employees by taking pictures of them; (3) picking up children early from school for personal reasons and failing to obtain approval from her supervisor to pick up the children early; (4) poor judgment in failing to pick up children who were stranded on the side of the road in the rain while their school bus was in need of repair; and (5) other good and just cause. (Exh. 11 to Armbrester Dep.; Messer Aff. at ¶ 24).

Armbrester contested the proposed suspension and the recommendation to suspend her for five days without pay was overturned at the meeting.  (Exh. 1 to Armbrester Dep.; Messer Aff. at ¶ 25).  Specifically, the Board concluded:

> The timing, circumstances and evidence of the charges cited in the Talladega City Board of Education's case against Ms. Armbrester do not support the Board's action and suggest personal reasons formed

the basis for Ms. Armbrester's suspension.  The instances cited were not habitual offenses, were actions that supervisors admitted were previously committed by other drivers and were actions for which other drivers had not been suspended or reprimanded.  The four incidents which form the basis for Ms. Armbrester's suspension were initiated by Wanda Cochran, her supervisor, who by all accounts but her own, had a personality conflict with Ms. Armbrester.  Additionally, three of the four complaints were issued soon after Ms. Armbrester had filed a grievance against Ms. Cochran and were, in part, supported by information from fellow employees with whom Ms. Armbrester had ongoing conflict or tension.  This ongoing conflict, the directions of Ms. Shirley to Ms. Armbrester and Ms. Cochran, her direct supervisor, to limit communications, and the inconsistent application of workplace discipline, support a conclusion that Ms. Armbrester's discipline was not for just cause.

(Exh. 1 to Armbrester Dep. at 9).

### C.    Armbrester's Physical Activity Restrictions

Beginning in August 2004, Shirley assigned Armbrester the "Tri-Systems" bus route for the 2004 to 2005 school year.  (Shirley Aff. at ¶ 4; Armbrester Dep. at 33).  That route covered more miles than Armbrester's previous route and involved the transportation of alternative school students.  (Shirley Aff. at ¶ 4; Armbrester Dep. at 37).  Nonetheless, Shirley considered the Tri-Systems route to be the "best" because "it took approximately the same length of time as the other routes" yet was compensated at a higher rate because it paid "for the base run, plus two runs due to the extra mileage . . . ."  (Shirley Aff. at ¶ 4).

Shortly after being assigned the new route, Armbrester presented Shirley with a doctor's note restricting her from pushing or pulling heavy objects due to neck pain.[6]  (Exh. 4 to Armbrester Dep.; Armbrester Dep. at 67, 295-96).  Thus, for several weeks Shirley aided Armbrester by pulling the

---

[6] According to Armbrester, nerve damage in her neck, spine, and shoulder affected her normal day-to-day activities of living, including cleaning, sweeping, putting on jewelry, putting on clothes, fixing her hair, cooking, and reaching up into cabinets.  (Armbrester Dep. at 295).

handle, raising the bus hood, and performing the mandatory pre-trip inspection for her.[7] (Shirley Aff. at ¶ 5). In fact, two other white female bus drivers were having their hoods pulled for them by their husbands who were also employees of the Board. (Shirley Dep. at 18-20). But when Messer received a complaint that Shirley was performing mandatory tasks for Armbrester,[8] Messer asked Shirley to inquire with the State Department of Education whether it was acceptable for someone else to pull the hood for a bus driver who was not able to perform that task herself. (Shirley Aff. at ¶ 8; Messer Aff. at ¶ 12). In connection with the inquiry, Shirley learned that a driver's inability to pull the hood of a bus was a matter of safety, because it indicated that the driver was also incapable of pulling or lifting a child to safety in an emergency situation. (Messer Aff. at ¶ 14; Shirley Aff. at ¶¶ 8, 9). Messer confirmed this finding himself with a call to the Director of Pupil Transportation, Joe Lightsley. (Messer Aff. at ¶ 14). Lightsley informed Messer that a driver who could not perform the mandatory pre-trip inspection should not be permitted to drive. (Messer Aff. at ¶ 14).

Armed with this newly-acquired knowledge, Shirley informed all bus drivers on or about September 30, 2004 that everyone would henceforth be required to pull their own hoods, and if they could not complete that task they would not be permitted to drive. (Shirley Dep. at 15-18; Shirley

[7] The bus hood is opened by pulling the handle forward so that the hood pops open. (Shirley Aff. at ¶ 7). The hood itself is not heavy, but pulling the handle requires either strength or leverage to release the hood lock mechanism. (*Id.*). The pre-trip inspection involves a number of checks of the operating systems on a school bus, including the lights, stop arm, windshield wipers and tires, as well as examining the engine under the hood and looking past the engine to the ground below it to make sure there are no leaks. (Shirley Aff. at ¶ 6). The pre-trip inspection is mandatory and must be done before each time a bus is scheduled to run its route, both in the morning and in the afternoon. (*Id.*).

[8] Messer received no complaints about the other two white bus drivers having their hoods pulled for them. (Shirley Dep. at 19-21). In fact, Messer was unaware that any bus driver was pulling or lifting the bus hood for any other bus driver until after he received the complaints about Shirley pulling the hood for Armbrester. (Messer Dep. at 9-10).

Aff. at ¶ 10; Messer Aff. at ¶ 16; Messer Dep. at 14).  Armbrester was specifically informed that, because there was no light duty work available for her, she would be required to take paid sick leave until her doctor released her from the pulling and lifting restrictions.  (Shirley Aff. at 11; Messer Aff. at 17).

Armbrester contends that Tracy Bentley, a white bus driver, continued to have her bus hood pulled by Russell Cheatwood even after the memorandum went out.  (Armbrester Dep. at 77-78). Armbrester alleges that she reported the violation to Shirley, but Shirley has no recollection of such complaint.  (Armbrester Dep. at 78; Shirley Dep. at 21).  In fact, Shirley recalls Bentley telling him that she could not raise her hood after having surgery.  (Shirley Dep. at 22).  "I told her if you cannot perform your duties, you cannot drive . . . I went down and showed her the way to pull it from the side with one hand . . . And to my knowledge, she's opened it every time since then."  (Shirley Dep. at 22).  Armbrester admits that, although she assumes that other employees pulled Bentley's hood for her, she never saw anyone pull Bentley's hood after Armbrester's complaint.  (Armbrester Dep. at 78-79).

School was not in session from September 30 through October 10, 2004 due to fall break and accordingly Armbrester was not charged sick leave for any of those days.  (Exh. 5 to Armbrester Dep.; Messer Aff. at ¶ 19).  An October 6, 2004 note from Armbrester's doctor ordered that she was to "avoid heavy pushing, pulling involving arms to prevent neck pain for 4-6 weeks – continuous such activity may cause the problem [to get] worse."  (Exh. 6 to Armbrester Dep.).  Thus, on October 11, 2004, Messer wrote Armbrester a memorandum noting that before Armbrester would be allowed to drive again, she would need an updated note from her doctor indicating that the pushing and pulling restrictions had been lifted.  (Messer Aff. at ¶ 19).

13

The following day Armbrester filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), charge number 130-2005-00156, alleging that the Board had subjected her to race, age, and disability discrimination, as well as retaliation.  (Exh. 24 to Armbrester Dep.).  Specifically, that charge of discrimination alleged:

> On or about August 23, 2004, I presented my employer with a medical excuse requesting an accommodation due to my being disabled.  The employer did honor my request for an accommodation. Upon being provided with an accommodation I was assigned to the most demanding bus routes with an unpredictable work schedule.  I have complained to management about the adverse conditions of my employment.  On October 1, 2004, my employer stopped providing me with an accommodation and suspended me.  On October 11, 2004, I was presented with a letter instructing me that I can only return to work when I am released to work without medical restrictions.  Two white employees who are disabled are still being provided with accommodations.

(Exh. 24 to Armbrester Dep.).

From October 11 through October 15, the Board placed Armbrester on paid sick leave. (Messer Aff. at ¶ 20; Exh. C to Messer Dep.).  On October 13, 2004 Armbrester's doctor released her to return to work, without restriction, as of October 18.   (Exh. 8 to Armbrester Dep.). Armbrester did in fact return to work on October 18 and resumed pulling her own hood to perform the pre-trip inspections.  (Armbrester Dep. at 104; Shirley Aff. at ¶ 11).

Three days before the winter holidays break, on December 13, 2004, Armbrester strained her left shoulder when pulling her bus hood for the pre-trip inspection.  (Armbrester Dep. at 52-55, 69). She was provided with an injury report, but did not complete that report and return it to the Board. (Exh. C to Messer Aff.).

14

D.      **Armbrester's Surgery and Return to Work**

On February 11, 2005, Armbrester underwent surgery on her right hand for carpal tunnel syndrome and used 34 days of sick leave to recuperate from the operation.  (Armbrester Dep. at 249, 258; Exh. C to Messer Aff.).  Upon her return to work in April 2005, Armbrester requested that she be taken off the Tri-Systems bus route.  (Shirley Aff. at ¶ 15; Armbrester Dep. at 32, 33, 139, 151, 249).  Shirley granted that request.  (Shirley Aff. at ¶ 15).

1.      **The May 2005 Incident**

On May 11, 2005, another incident occurred on school grounds between Armbrester and Higgins.  (Armbrester Dep. at 142-43).  By all accounts, Armbrester was in her personal vehicle driving to the school office to clock out and Higgins was walking through the parking lot. (Armbrester Dep. at 142-43).  Higgins complained to Messer that Armbrester operated her vehicle in such a manner as to intimidate Higgins.  (Exh. 13 to Armbrester Dep.).  Armbrester sharply denied that she engaged in such behavior by way of letter addressed to Messer and dated May 13, 2005. (Exh. 14 to Armbrester Dep.).

> I deny each and every allegation in your May 11, 2005 letter to me. I am totally innocent and in fact this is a ploy against me by a few employees and supervision to retaliate against me because I filed an OCR and an EEOC complaint against the System and Wanda Cochran.  Lillian Dates Higgins, a friend of Wanda's, is already convicted for pulling a gun on me and now she and some of her friends are lying about an incident, claiming I operated my personal vehicle in a manner that intimidated her.  She walked out in front of me and stood there as if to dare me to hit her and would not move for a long time.  I reported this incident to my supervisor, you, and the police.  You chose to believe Lillian however, I am the innocent one.
>
> Now you are adding false charges to bolster your retaliation of me stating that my driving has received complaints and if this continues you will discipline me.  What about all of the violations that I have

15

documented against these same employees and nothing has been done
to them?  How do you explain that you believe her instead of me?
Why don't you stop this retaliation as it is unlawful?

It is obvious that you are prejudice against me and I can not receive
a fair investigation while you and my supervisors are personally
involved.

(Exh. 14 to Armbrester Dep.).  In connection with her complaint, Armbrester provided Shirley with

the names of two individuals, Charles Lee and Ronald Dye, who witnessed the incident.  (Armbrester

Dep. at 144).   Each of those individuals gave written statements; however, those statements

corroborated Higgins' version of the event, and not that of Armbrester.  (Shirley Aff. at ¶ 16; Exh.

A to Shirley Aff.).

Messer responded to Armbrester's letter of May 13, 2005 and in doing so explained to

Armbrester that her witnesses corroborated Higgins' version of events.  (Exh. 15 to Armbrester

Dep.).  The same letter advised the following:

[I]t has come to my attention that you have continued to videotape
fellow employees while you are on the job.  Please refrain from doing
so as it is dangerous  to operate a vehicle and operate a video camera
at the same time.  If you have complaints, please bring them to your
supervisor's attention.  If you find no relief after informing your
supervisor, please bring your complaints to me.  It is not in your job
description to videotape fellow employees.[9]

(Exh. 15 to Armbrester Dep.).

### 2.      The Incidents of Late Summer and Early Fall 2005

The summer months continued to prove trying for Armbrester.  On August 19, 2005 she

found a trail of white and grainy "stuff" that started at the top of the stairs to the office or at the

---

[9] Armbrester testified that she was not videotaping co-employees herself; her grandson, Cory
Twyman, was doing the videotaping.  (Armbrester Dep. at 259-60).

football field[10] and ended at the bottom step of her bus.  (Armbrester Dep. at 267-68; Exh. 28 to Armbrester Dep.).   Armbrester believes that Charles Lee spread the substance because "Mrs. Cochran have gotten Mr. Lee to lie on me and go to Mr. Messer and say I done this, I done that, but everybody else can do what they said I do and get away with it."  (Armbrester Dep. at 268-69).

A week later the assistant principal of Zora Ellis Jr. High School, Melissa Howle-Dyer, wrote a complaint letter to Messer detailing actions of Armbrester which she felt jeopardized the safety of a number of students.  (Exh. 19 to Armbrester Dep.).   Dyer reported that, as she was helping an eighth grade student find her bus:

> I obtained eye contact with the driver of the first bus [Sandra Patterson] on the left side of the street in front of Zora Ellis.  I indicated to the driver with a nod of my head and by waving my left hand that I was dismissing her.  I continued to hold up my right hand indicating for the buses in front of Dixon to remain still.
>
> When I turned my head to get eye contact with the first bus [Armbrester] on the Dixon side, the driver started to move the bus. I looked directly at the driver and shook my head indicating NO, not to leave.  I still had my right hand up in an indication not to move the bus.  However, the driver refused to heed my directions.  I continued to shake my head NO and hold my hand up until bus 99-27 [Armbrester] was even with me in the crosswalk.

(Exh. 19 to Armbrester Dep.).  Sandra Patterson corroborated Dyer's account of the event, stating that "Mrs. Dyer was still holding the left as I pulled off.  As I was getting over bus 27 [Armbrester] came from nowhere so I had to swerve to avoid her hitting me."  (Exh. 17 to Armbrester Dep.). Patterson indicated that her swerve allowed Armbrester's bus to go by.  (Exh. 17 to Armbrester Dep.).  But as Armbrester approached a green light, Patterson reported that Armbrester slammed on

---

[10] Armbrester's testimony is unclear as to where the trail of the white substance began. (Armbrester Dep. at 267-68).  However, Shirley's affidavit states that the trail led "down the steps from the football field to where her bus was parked."  (Shirley Aff. at ¶ 24).

her brakes, causing Patterson to do the same.  (Exh. 17 to Armbrester Dep.).  Statements were taken

from 10 students who were passengers on Patterson's bus.  (Exh. 18 to Armbrester Dep.).  Those

statements included accounts as follows:

> Bus 27 cut us off and Ms. Patterson had to slam on the brakes . . .
>
> Bus 27 was speeding cut bus 4 off . . .
>
> Yesterday we about got hit by bus 27.  We were just driving along when she was speeding and came right around from behind us and passed us and slammed on the brakes and made us slam on the brakes.  She cut right in front of us.  It scared us a little when we slammed on the brakes.
>
> Yesterday bus 27 cut us off and we had to put on the brakes real fast to prevent an accident . . .

(Exh. 18 to Armbrester Dep.).

Armbrester hotly contests that the incident occurred as described by Dyer, Patterson, and the

student passengers.  She contends that her line of buses had already started to move, and as her bus

moved forward, Patterson attempted to maneuver her own bus in front of Armbrester.  (Hearing

Transcript from October 10, 2005 at 59, 71).  Because there was insufficient distance between the

two buses for such a maneuver, Patterson was forced to slam on her brakes.  (Hearing Transcript

from October 10, 2005 at 72).

### E.    The Recommendation of the Termination of Armbrester's Employment

The incident at Zora Ellis Jr. High School, as well as continued complaints from parents,

"compelled" Messer to act "before a child was seriously injured due to Ms. Armbrester's lack of

judgment." (Messer Aff. at ¶ 29)  To that end, on September 15, 2005 Messer informed Armbrester

that he would recommend to the Board that her employment be terminated but that she would have

an opportunity to have a conference with the Board with regard to that recommendation.  (Messer Aff. at ¶ 31; Exh. D to Messer Aff.).

Five days before the Board meeting, on October 5, 2005 Armbrester performed a pre-trip inspection on her bus and found what she believed to be blood near the hood latch.  (Exh. 30 to Armbrester Dep.; Armbrester Dep. at 199).  She showed the substance to two other bus drivers and Shirley.  (Armbrester Dep. at 199-200).  Upon examination, Shirley came to the conclusion that "it did not look or act like blood does when I cleaned if off the fender.  It looked to me like droppings from birds that have eaten poke salad."  (Shirley Aff. at ¶ 21).  On another morning sometime before her termination,[11] Armbrester was performing her pre-trip inspection and noted what she believed to be fire extinguisher powder sprayed around her seat and on the maintenance buttons of her bus.  (Armbrester Dep. at 263-64).

The Board voted to terminate Armbrester's employment on October 10, 2005 and Armbrester was made aware of that decision on the following day.  (Messer Aff. at ¶ 32; Exh. E to Messer Aff.).  She challenged the termination decision[12] and was placed on paid administrative leave pending the outcome of the appeal.  (Messer Aff. at ¶ 32).   Then, on October 13, 2005 Armbrester filed EEOC

---

[11] The specific date for this alleged event is not know.  Armbrester testified that it occurred in 2004 or 2005 "before I got terminated."  (Armbrester Dep. at 264).

[12] Armbrester had photographs of co-workers engaging in workplace violations.  One picture dated September 2005 allegedly depicts Sandra Patterson cutting off drivers in a left-hand lane to turn left.  (Exh. 31 to Armbrester Dep.).  However, there is no evidence that Armbrester ever reported Patterson's alleged actions to anyone.

Several additional photographs taken by Armbrester were discussed during her deposition. Exhibit 33 to Armbrester's deposition is purportedly a picture of Jeff Richard and Henry Ashley, Board employees, driving a Board vehicle to Piggy Wiggly for personal use.  Such use is against Board policy.  (Shirley Dep. at 38-39; Armbrester Dep. at 290).  Exhibit 37 is purportedly a picture of other bus drivers speeding in school zones.  (Armbrester Dep. at 291).  However, there is no evidence that Armbrester reported these observations to her supervisors.

charge number 130-2005-05355 alleging that a "derogatory letter" placed in her personnel file on

May 11, 2005 was "retaliation for my previously filed charge of discrimination [filed on October 12,

2004]." (Exh. 43 to Armbrester Dep.). On October 27, 2005, Armbrester filed another EEOC

charge alleging that the proposed termination was "retaliation for previously filed charges of

unlawful employment discrimination." (Exh. 44 to Armbrester Dep.). Specifically,

> On October 10, 2005 I was discharged. I was informed in a letter
> signed by the Superintendent, Leonard Messer, that I was being
> discharged for unsatisfactory job performance, insubordination, other
> good and just causes including moving violations, failing to heed the
> directions on [sic] an Assistant Principal, changing my bus route
> without authorization and failing to pick up all students on my
> assigned route. Others who have violated the same offenses have not
> been discharged as I was. I deny all of the offenses of which I have
> been charged.

(Exh. 44 to Armbrester Dep.).

### F.    The Arbitrator's Decision

The termination matter was arbitrated and on July 21, 2006 the arbitrator issued an opinion

finding that Armbrester had committed a number of violations but reducing the charge to a twenty

working day suspension without pay. (Exh. F to Messer Aff. at 30). The arbitrator based his

conclusion in part on the fact that "prior to 2004, the Grievant had never been cited for violations

of any school rule, policy, or procedure . . . the Grievant was not a habitual offender." (Exh. F to

Messer Aff. at 27). Nevertheless, as to the specific alleged infractions, the arbitrator found in

pertinent part:

> while the evidence did not demonstrate that Grievant was speeding,
> it showed clearly and convincingly that she was driving in an unsafe
> manner;

Grievant was not insubordinate because . . . the alleged direction was not clear;

Grievant's actions of delivery of students to their destinations at improper times is consistent with a pattern and practice of exhibiting insensitivity to their needs of safety and failure to follow directives of supervision;

the lack of action by Grievant in [the stranded bus] matter clearly demonstrates a pattern and procedure of neglect and insensitivity toward the needs and safety of students in the district;

evidence of speeding supports a pattern and practice of driving in an unsafe manner and exposing others to a risk of harm; and

the infractions committed by the Grievant lack justification and could have caused harm to students, employees, and property, as well as to the reputation of the school as an institution, and therefore should not be tolerated.

(Exh. F to Messer Aff. at 15, 18, 20, 22, 23, 25).

### G. Armbrester's Complaints of Harassment After Returning to Work in September 2006[13]

Armbrester alleges that she has been subjected to several instances of "harassment" since filing her EEOC charges and returning to work, although she cannot recall specific dates. On one occasion, Armbrester found water poured into a tray on her bus. (Armbrester Dep. at 265). The tray is where Armbrester places her personal belongings while driving the bus. (Armbrester Dep. at 265). Armbrester complained to Shirley about this incident, and the water was cleaned with paper towels. (Shirley Aff. at ¶ 19; Armbrester Dep. at 265-66). On another "one or three" or "one or five" occasions, Armbrester alleges that she was harassed by telephone calls coming from the Board's

---

[13] The court notes that Plaintiff has made no claim of hostile work environment in this case. Thus, any argument by Plaintiff about a hostile work environment will not be considered (other than as support for Plaintiff's other claims) as such a claim is not before this court. (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 26).

maintenance shop.  (Armbrester Dep. at 219-22).  Armbrester characterized the telephone calls as harassment because "they call, and when I answer, [they] hang up."[14]  (Armbrester Dep. at 220). Finally,  Armbrester complained to Shirley that someone put a stake in the ground on the right side Armbrester's bus.[15]  (Armbrester Dep. at 298-99).  Shirley investigated the complaint, found the stake to be a limb about fourteen to fifteen inches in length that "was not driven into the ground, but someone had put it up."  (Shirley Dep. at 25).  However, when the limb was touched it fell to the ground and was picked up and discarded by Shirley.  (Shirley Aff. at ¶ 23).

Despite all of the troubles Armbrester experienced at work over the past several years, she remains employed by the Board as a bus driver.  She brings this lawsuit to obtain "permanent relief from the unlawful discriminatory and retaliatory practices involving the terms and conditions of her employment by the Defendant."  (Compl. ¶ 1).

## IV.   Applicable Substantive Law and Discussion

### A.   Disparate Treatment on the Basis of Race Under Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983 (Counts One and Two)

#### 1.   General Legal Framework

The Eleventh Circuit applies the same analytical framework to Title VII, § 1981, and § 1983 race discrimination claims.  *See Hudson v. Mr. Burch Formal Wear, Inc.*, 2006 WL 2351837, No. 05-16269, at *1 (11th Cir. Aug. 15, 2006) (citing *Cooper v. Southern Co.*, 390 F.3d 695, 724-25 (11th Cir. 2004)); *see also Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 843 n. 11 (11th

---

[14] Armbrester does not know exactly when this incident occurred.  "I'm not sure what was the time period."  (Armbrester Dep. at 220).

[15] Armbrester does not know exactly when this incident occurred.  She testified only that it occurred "since I've filed charges [of discrimination against the Board]."  (Armbrester Dep. at 299).

Cir. 2000); *Cross v. Alabama*, 49 F.3d 1490, 1507-08 (11th Cir. 1995).  Therefore, Counts One and

Two are considered collectively herein under the rubric of Title VII case law.

Title VII prohibits employers from discriminating against employees because of their race.

*See* 42 U.S.C. § 2000e-2(a)(1)-(2); *see also* 42 U.S.C. § 1981.  To succeed on a Title VII race claim,

a plaintiff bears the burden of producing a *prima facie* case of discrimination.  *Holifield v. Reno*, 115

F.3d 1555, 1561 (11th Cir. 1997).  A plaintiff may discharge his burden by offering "direct evidence,

circumstantial evidence or statistical evidence."  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318,

1330 (11th Cir. 1998).  Here, Plaintiff offers no direct or statistical evidence and must proceed under

a theory of circumstantial evidence.[16]

Circumstantial evidence claims of discrimination are evaluated using the "now-familiar

framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Department of Community Affairs

v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)."  *Combs v. Plantation Patterns*,

106 F.3d 1519, 1527 (11th Cir. 1994).  Under that framework, a plaintiff first has the burden of

establishing a *prima facie* case of discrimination, which creates a rebuttable presumption that the

employer acted illegally.  *See id.* at 1527-28.  Once a plaintiff has established a *prima facie* case, and

raised the presumption of discrimination, the burden of production shifts to the employer to articulate

a legitimate, nondiscriminatory reason for its actions.[17]  *See Combs*, 106 F.3d at 1528.  The employer

---

[16] Plaintiff effectively concedes this point as her Response in Opposition to Defendant's
Motion for Summary Judgment (Doc. # 39) analyzes the case only from the standpoint of the
*McDonnell Douglas* burden-shifting analysis used for circumstantial cases. (Pl.'s Response in Opp'n
to Def.'s Mot. for Summ. J. at 22).

[17] *See Chapman*, 229 F.3d at 1034 (stating that "[a] subjective reason is a legally sufficient,
legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific

"need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254-55; *see Chapman*, 229 F.3d at 1024.

If the employer satisfies its burden by articulating one or more legitimate nondiscriminatory reasons for its actions, then the presumption of discrimination falls, and the burden of production shifts back to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[18]  Where a defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  *See Chapman*, 229 F.3d at 1024-25. Although the *prima facie* case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  *See Combs*, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the *McDonnell Douglas* and *Burdine* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Burdine*, 450 U.S. at 253.  Given that the ultimate burden of persuasion always lies with the employee, a plaintiff pursuing an employment discrimination claim may defeat a summary judgment motion either by producing sufficient evidence from which a rational trier of fact could conclude that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence from which a rational trier of fact could disbelieve the employer's proffered legitimate

---

factual basis upon which it based its subjective opinion.").

[18] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  *See Chapman*, 229 F.3d at 1030.

reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination. *See Reeves*, 530 U.S. at 146-49 (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000); *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000); *Combs*, 106 F.3d at 1529-38 (interpreting *Hicks* and the post-*Hicks* case law); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 920-21 (11th Cir. 1993).

It is under this framework that the court evaluates Armbrester's claims of disparate treatment because of race.

### 2.      Armbrester's Disparate Treatment Claims

#### a.      The *Prima Facie* Case

In general, a plaintiff establishes a *prima facie* case of disparate treatment employment discrimination by showing that she is a qualified member of a protected class, was subjected to an adverse employment action, and other similarly situated employees outside the plaintiff's class were treated more favorably.[19] *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *see also Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) and *Holifield*, 115 F.3d at 1562 (11th Cir. 1997). Here, there is no dispute that

---

[19] *See also McDonnell Douglas*, 411 U.S. at 802 n.13 (observing that "[t]he facts necessary will vary in Title VII cases, and the specification above of the *prima facie* proof required from respondent is not applicable in every respect in different factual situations.").

Armbrester, an African American, is a member of a protected class.  Likewise, the fact that Armbrester has been employed by the Board for over twenty years indicates that she is indeed qualified to perform the job of bus driver.  *See Crapp v. City of Miami Beach*, 242 F3d 1017, 1020 (11th Cir. 2001).  Armbrester now bears the burden of producing evidence sufficient for a reasonable jury to conclude that she has suffered an adverse employment action and that a similarly situated employee of another class was treated more favorably.  *Holifield*, 115 F.3d at 1562.

### i.      The Allegedly Adverse Employment Actions

Armbrester contends that four actions by the Board amount to adverse employment actions prohibited by Title VII.  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 23-27).  However, not all conduct by an employer negatively affecting an employee constitutes an adverse employment action.  *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001).  To prove an adverse employment action in the disparate treatment context, "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment."[20]  *Wallace v. Georgia*

---

[20] Both parties assume that the standard articulated by the Supreme Court in *Burlington Northern & Santa Fe R.R. Co. v. White*, 126 S. Ct. 2405 (2006) for establishing adverse employment actions in retaliation claims applies equally to establish adverse employment actions in disparate treatment claims.  (*See* Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 22-23 and Def's Mem. Brief in Support of Mot. for Summ. J. at 22-23).  Such a definitive assumption is misplaced. Unpublished decisions in the Eleventh Circuit analyzing disparate treatment actions after *Burlington* have failed to apply the *Burlington* adversity standard to disparate treatment claims.  *See Wallace v. Georgia Dep't of Transportation*, 212 Fed. Appx. 799,801 2006 WL 3626967, No. 06-13345 at **2 (11th Cir. Dec. 13, 2006) ("Under the standard of review articulated in *Davis*, [plaintiff] cannot establish that his written reprimand constitutes an adverse employment action needed for a *prima facie* disparate treatment case."); *Njie v. Regions Bank*, 198 Fed. Appx. 878, 882-83, 2006 WL 2711953, No. 05-13061 at **3 (11th Cir. Sept. 22, 2006) (applying the *Davis* analysis of adversity to plaintiff's disparate treatment claim); *Davis v. U.S. Postmaster Gen.*, 190 Fed. Appx. 874, 876, 2006 WL 2087569, No. 05-14911 at **2 n.2 (11th Cir. July 26, 2006) ("In reaching this conclusion on [plaintiff's] disparate treatment claim, we need not discuss the Supreme Court's recent decision about the nature of an adverse employment act in a different context: the context of a retaliation claim.") And while unpublished decisions are not considered binding precedent, they are persuasive

*Dep't of Transportation*, 212 Fed. Appx. 799,801 2006 WL 3626967, No. 06-13345 at **2 (11th Cir. Dec. 13, 2006) (quoting *Davis*, 245 F.3d at 1238) (emphases in original).  Moreover, "the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."  *Wallace*, 2006 WL 3626967 at **2 (quoting *Davis*, 245 F.3d at 1239).

First, Armbrester alleges that her assignment to the Tri-Systems route was adverse.  "While there were fewer students and fewer stops, the students had presumably been expelled for behavioral problems, and were less desirable as bus riders than students attending ordinary schools."  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 23).  Although Armbrester presumes that the children riding on that route had behavioral problems, there is no evidence in the record to support that contention.  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 23).  In fact, the only evidence in the record establishes that student behavioral problems existed on the Tri-Systems route as well as the non-Tri-Systems routes.  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 23-24).  And the record is clear that the Tri-Systems route was considered by the Board to be the "best" because it was compensated at a higher rate and involved fewer students and fewer stops.  (Shirley Aff. at ¶ 4).  No reasonable bus driver would have viewed the assignment to the Tri-Systems route as adverse – in fact, a reasonable driver would have viewed the assignment favorably.  For this reason, Armbrester's claim of disparate treatment based on her assignment to the Tri-Systems bus route fails the *prima facie* adversity analysis.

---

authority and valuable indicators as to what the Circuit would decide in a published opinion.  *See* Eleventh Circuit Rule 36-2.

The second purported adverse action that Armbrester complains of is the Boards's "refus[al] to reasonably accommodate Mrs. Armbrester for her disability" by lifting her bus hood so that she could perform mandatory pre-trip inspections. (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 24). But Armbrester's terms, conditions and privileges of employment were not seriously and materially affected by the Board's decision that Armbrester was unqualified to drive during the time period she could not pull her own bus hood. *See Wallace*, 2006 WL 3626967 at **2 (quoting *Davis*, 245 F.3d at 1238). Instead, Armbrester was allowed to take seven days of paid sick leave and suffered no loss of compensation as a result. (Messer Aff. at ¶ 20; Exh. C to Messer Aff.; Armbrester Dep. at 104; Shirley Aff. at ¶ 11; Exh. 8 to Armbrester Dep.). Thus, this claim of disparate treatment also fails the *prima facie* adversity analysis.

Next, Armbrester contends that she was subjected to an adverse employment action when Messer recommended to the Board that she be placed on a temporary suspension for exceeding the speed limit, passing a stalled bus without rendering aid, picking up students on her route early, and taking pictures of co-workers. (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 25). But Armbrester contested the proposed suspension and the recommendation was *overturned*. (Exh. 1 to Armbrester Dep.; Messer Aff. at ¶ 25). Thus, she suffered no serious and material change in the terms and conditions of her employment and this claim fails to meet the disparate treatment adversity threshold. *See Wallace*, 2006 WL 3626967 at **2; *see also Embry v. Callahan Eye Found.*, 147 Fed. Appx. 819, 829, 2005 WL 2009046, No. 03-2608 at **8 (11th Cir. Aug. 23, 2005) (holding that a one-day suspension without pay did not amount to an adverse employment action supporting plaintiff's claim for disparate treatment).

Finally, Armbrester challenges the recommendation of the termination of her employment as "the ultimate of adverse actions."  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 26). But here again Armbrester challenged the termination decision, was placed on *paid* administrative leave pending the outcome of the appeal, and ultimately succeeded in having the decision to terminate her employment *overturned*.  (Messer Aff. at ¶ 32; Exh. F to Messer Aff.).  She returned to work in September 2006 and advances no argument that upon her return to work her terms, conditions, and/or privileges of employment had been materially altered.[21]  Thus, the recommended termination fails to meet the adversity threshold established by *Davis*.

### ii.    The Alleged Comparators

Assuming, *arguendo*, that Armbrester had established that the actions of the Board rose to the required level of adversity, at least two sub-parts of her claim would nevertheless fail to pass the comparator prong of the *prima facie* case.[22]  Comparators are necessary to the *prima facie* disparate treatment analysis – there must be sufficient evidence for a jury to conclude that other employees outside of plaintiff's class were treated more favorably.  *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *see also Jones v. Bessemer Carraway Med. Cntr.*, 137 F.3d 1306, 1311 (11th Cir. 1998), *superceded in non-relevant part on denial of reh'g*, 151 F.3d 1321 (11th Cir. 1998).

Armbrester has failed to come forward with any evidence that only she, a black bus driver, was assigned the Tri-Systems bus route.  The undisputed evidence shows that a white male driver

---

[21] *See* Section III.G., *supra*.  Armbrester's complaints of "harassment" post September 2006 are minor and establish not even a hint of discrimination on the basis of race.

[22] Because the suspension and termination findings assumed the sufficiency of comparators, the court here assumes, without deciding, that Armbrester has presented comparators for those employment actions of the Board.  (Exh. 1 to Armbrester Dep. at 9; Exh. F to Messer Aff. at 27).

had the route before Armbrester and a white male driver had the route after Armbrester.  (Armbrester Dep. at 36-37).

Similarly, Armbrester has failed to come forward with evidence that only she was not permitted to work while unable to perform the task of lifting the bus hood.  In fact, the evidence shows that once the Board became aware that some bus drivers were not pulling their own hoods, *all* drivers, including two white females, were instructed that a driver's inability to pull her own hood was a matter of safety, and any driver who could not perform the mandatory pre-trip inspection would not be permitted to drive.  (Shirley Aff. at ¶¶ 8, 9, 10; Shirley Dep. at 15-18; Messer Aff. at ¶¶ 14, 16; Armbrester Dep. at 78-79; *see also* Def.'s Mem. Brief in Support of Mot. for Summ. J. at 24-25).

The absence of any adverse employment action, coupled with the absence of comparators for at least two of those allegedly adverse employment actions,[23] renders Armbrester's claims of disparate treatment on the basis of race meritless.

> **b.    Armbrester's Failure to Rebut the Board's Articulated Legitimate, Nondiscriminatory Reasons for the Allegedly Adverse Employment Actions**

Even assuming Armbrester had successfully established a *prima facie* case of race discrimination, at least three subparts to her claims would nevertheless fail on the pretext analysis. Armbrester attempts to argue that she has "rebutted each and every illegitimate and discriminatory reason proffered by the Defendant for its actions."  (Pl.'s Response in Opp'n to Def.'s Mot. for

---

[23] The court is aware that the failure to prove this final element of the *prima facie* case is not necessarily fatal to Armbrester's claim: "[i]f a plaintiff fails to show the existence of a similarly-situated employee, summary judgment is appropriate where no other evidence of discrimination is present."  *Holifield*, 115 F.3d at 1562 (internal citation omitted).  However, as explained in Section IV.A.2.b., *supra*, Armbrester has failed to show any evidence of discrimination.

Summ. J. at 45).  In support of this argument, plaintiff cites, at length, the opinions of the hearing officers after the suspension and termination proceedings.  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 38-45).

### i.    The Board's Requirement that Bus Drivers be Physically Able to Pull the Bus Hoods

The Board has clearly established that it is a matter of safety that a bus driver be able to pull the hood of a bus.  (Messer Aff. at ¶ 14; Shirley Aff. at ¶¶ 8, 9).  A bus driver unable to do so would similarly be unable to assist a child in an emergency situation.  (Messer Aff. at ¶ 14; Shirley Aff. at ¶¶ 8, 9).  Armbrester's attempt to refute this claim is half-hearted – she states only that Shirley acknowledged that during his tenure as the maintenance and transportation supervisor, a bus driver has never had to lift or rescue a student in an emergency situation.[24]  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 31).  That argument ignores the obvious.  It may be that a bus driver will never be called upon to rescue a child; however, in an emergency situation, the ability to do so is of critical importance.[25]  *Cf.* 29 C.F.R. Pt. 1630, App. 1630.2(n) "Essential Functions" ("The

_____

[24] The court is providing Plaintiff with the benefit of the doubt in considering this argument as one related to her assertion that the Board's reasons for terminating her are a pretext for race discrimination, as she really has only advanced it in the context of discussing the *prima facie* case of discrimination under the ADA and the Rehabilitation Act.

[25] Moreover, the effect of Armbrester's refutation on this point is only to quarrel with the veracity of the articulated reason.  *See Chapman*, 229 F.3d at 1030; *see also Wilson v. B/E Aerospace*, 376 F.3d 1079, 1092 (11th Cir. 2004) (holding that plaintiff's self-serving assertions that the articulated reason is not true did not establish that she had been discriminated against).  It does nothing to meet the proffered reason head on and rebut it.  *See Chapman*, 229 F.3d at 1030 (holding that if the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it).; *see also Wilson*, 376 F.3d at 1088 (11th Cir. 2004).  For this separate and additional reason, Armbrester's disparate treatment claim, based on the Board's requirement that she be physically able to pull the bus hood before being permitted to drive, fails.

consequences of failing to require the employee to perform the function may be another indicator of whether a particular function is essential. For example, although a firefighter may not regularly have to carry an unconscious adult out of a burning building, the consequence of failing to require the firefighter to be able to perform this function would be serious.")

### ii.    The Recommended Suspension

As grounds for the January 2005 recommended suspension, Messer cited Armbrester's: (1) driving at a high rate of speed; (2) harassing employees by taking pictures of them; (3) picking up children an hour and a half early from school for personal reasons and failure to obtain approval from a supervisor before doing so; (4) poor judgment in failing to pick up children who were stranded on the side of the road in the rain while their school bus was in need of repair; and (5) other good and just cause.  (Exh. 11 to Armbrester Dep.; Messer Aff. at ¶ 24).  Armbrester attempts to rebut these articulated reasons by stating: (1) the letter of reprimand regarding the speeding incident came from Cochran with whom Armbrester had a history of discord and witnesses to the event also had past conflicts with Armbrester; other drivers had driven over the speed limit without being reprimanded; (2) Messer told Armbrester that she should proceed with caution in photographing employees, but never told her that her actions were illegal; (3) while not the proper procedure, Armbrester did clear the request to pick up the children early with the principal of the school; and (4) Cochran did not instruct Armbrester to load the stranded children onto her bus.  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 39-40; Exh. 1 to Armbrester Dep. at 6-8).

Although Armbrester's rebuttals do cover each of the Board's articulated legitimate nondiscriminatory reasons for the proposed suspension, they once again effectively do nothing more than quarrel with the reason given by the Board for the recommendation.  *See Chapman*, 229 F.3d

at 1030; *see also Wilson*, 376 F.3d at 1092 (holding that plaintiff's self-serving assertions that the articulated reason is not true did not establish that she had been discriminated against). And they certainly do nothing to show (as Armbrester has the ultimate burden of showing) that she has been discriminated against because of a protected characteristic. If anything, Armbrester's "evidence of pretext" establishes the depth of her personality conflict with assistant supervisor Cochran (who is herself a black female) (Shirley Aff. at ¶ 3; Armbrester Dep. at 25), not race discrimination.

### iii.    The Recommended Termination

As grounds for the September 2005 recommendation of the termination of Armbrester's employment, the Board articulates numerous legitimate non-discriminatory reasons: (1) continued driving at a high rate of speed; (2) failure to obey the rules of the road; (3) failure to heed the direction of the assistant principal; (4) jeopardizing the safety of students in the operation of the bus; (5) changing bus routes without authorization; and (6) failure to pick up all students on the route. (Exh. D to Messer Aff.). Other specific incidents given to support the recommendation were: (1) speeding; (2) pulling around buses; (3) leaving children on the side of the road near railroad tracks; (4) picking up children from the systems or home early; and (5) covering up the camera box. (Exh. F to Messer Aff. at 7). To support the charge that Armbrester failed to perform her duties in a satisfactory manner, the Board articulates Armbrester's: (1) refusal to pick up students; and (2) failure to pick up students on time. (Exh. F to Messer Aff. at 7). To support the charge that Armbrester was insubordinate, the Board articulates that Armbrester: (1) refused directives of her supervisor; (2) changed her bus route; and (3) pulled around other buses and did not pick up students after she had been warned not to engage in such conduct. (Exh. F to Messer Aff. at 7). Finally, the

Board advances that it proposed the termination because of Armbrester's "personal conflicts with other drivers and students." (Exh. F to Messer Aff. at 7).

Armbrester attempts to rebut these articulated reasons by offering that other drivers consistently drove at a high rate of speed and did not obey the rules of the road yet were not recommended for termination. (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 40-41, 43-45). She says that only when new stops were added was she late picking up children on her route. (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 41). She also says that she covered the camera box on her bus with Scripture and that regardless the camera was not functional. (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 42). She claims that she was not insubordinate because directives from supervisors were unclear. (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 42-43). Finally, she stresses that the arbitrator found "most of the allegations against her in this matter to be unproven" and that the Board failed to offer her assistance to correct the deficient job performance. (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 44-45).

Not only has Armbrester failed to refute all of the Board's numerous articulated reasons for the recommended termination, but the "evidence of pretext" that she presents once again does nothing more than quibble with the reasons given by the Board for the recommendation. *See Chapman*, 229 F.3d at 1030; *see also Wilson*, 376 F.3d at 1092 (holding that plaintiff's self-serving assertions that the articulated reason is not true did not establish that she had been discriminated against). And they certainly do nothing to bolster Armbrester's ultimate burden of showing that she has been discriminated against because of her race. If anything, Armbrester's "evidence of pretext" establishes the depth of her personality conflict with assistant supervisor Cochran (also a black female). (Shirley Aff. at ¶ 3; Armbrester Dep. at 25).

34

The absence of any adverse employment action, coupled with the absence of comparators for at least two of those allegedly adverse employment actions[26] and the absence of pretext for at least three of those allegedly adverse employment actions, renders Armbrester's claims of disparate treatment on the basis of race meritless several times over.[27]

**B.    Discrimination under the Americans with Disabilities Act and the Rehabilitation Act (Counts Three and Five)**

Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases, *see* 29 U.S.C. § 794(d), and cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa. *See Cash v. Smith*, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000) (citing *Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1132 n.2 (11th Cir. 1996)). Therefore those two claims will be discussed together herein.

In order to establish a *prima facie* case of discrimination under the ADA and the Rehabilitation Act, the plaintiff must show that: (1) she is disabled; (2) she was a qualified individual

---

[26] *See* footnote 23, *supra*.

[27] In addition, Armbrester's argument ignores the fact that even the arbitrator who reinstated her still found she was subject to discipline for numerous infractions of Board rules. (Exh. F to Messer Aff. at 15, 18, 20, 22, 23, 25). The fact that the arbitrator believed that a twenty-day suspension rather than discharge was warranted is of no moment. Unless Plaintiff can show (as she has not done here) that her discipline was more harsh than that of a non-minority who committed the same infraction, this court will not second guess what level of punishment was appropriate here. The court does not sit as a super-personnel director to split such fine hairs. *Cooper v. Southern Co.*, 390 F.3d 695, 730 (11th Cir. 2004); *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004); *Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001); *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir. 2001); *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). The question here is whether the Board considered Armbrester's race, not whether she should have been discharged rather than merely suspended. This is particularly the case where, as here, a plaintiff has not presented evidence of other employees outside the protected class who violated a similar work rule but who were treated more favorably.

at the relevant time; and (3) she was discriminated against because of her disability.  *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001).  Armbrester's claims under Counts Three and Five of the Complaint fail on a very basic level – she has failed to show that she is disabled as that term is defined by the Acts.

### 1.      Armbrester's "Disability"

The ADA and the regulations interpreting the Rehabilitation Act both define "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  *Rossbach v. City of Miami*, 371 F.3d 1354, 1357 (11th Cir. 2004); *see also* 42 U.S.C. § 12102(2) and 34 C.F.R. § 104.3(j)(1).  Armbrester contends that she fits under the first definition because she could not engage in "major life activities."  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 29).

But the first definition of "disability" involves a three-step analysis.  *Rossbach*, 371 F.3d at 1357 (citing *Bragdon v. Abbott*, 524 U.S. 624 (1998)).  First, a plaintiff must be physically or mentally impaired.  Second, the life activity the plaintiff claims has been limited must be a "major life activity" under the ADA.  *Id.*  "Major life activities," according to EEOC regulations, include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii).[28]  Finally, the plaintiff must establish that the impairment "substantially limits" that life activity.  *Rossbach*, 371 F.3d at 1357.  The regulations discuss three factors in assessing the substantiality of the limitation: (1) nature and

---

[28] The Eleventh Circuit "frequently looks to the EEOC regulations for interpretive guidance regarding Subsection A of the ADA."  *Rossbach*, 371 F.3d at 1357 n.4; *see also Cash*, 231 F.3d at 1305.

severity of the impairment; (2) duration or expected duration of it; (3) permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment. *See* 29 C.F.R. § 1630.2(j)(2).  Indeed, "a diminished activity tolerance for normal daily activities such as lifting, running and performing manual tasks, as well as lifting restrictions" does not constitute a disability under the ADA or Rehabilitation Act. *See Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1222 (11th Cir. 2000).

Armbrester is disabled within the meaning of the Acts only if she can establish that her neck pain satisfies this rubric of analysis.

### a.      The "Major Life Activities" Analysis

The record reveals that Armbrester suffered from neck pain which diminished her ability to perform some household and personal tasks for less than two months.  (Armbrester Dep. at 67, 71-72, 104, 295-96; Exh. 4 to Armbrester Dep.; Shirley Aff. at ¶ 11).  As far as her home life was concerned, Armbrester testified as follows:

> Q:    And did that nerve damage affect any kind of normal day-to-day activities, whether it be putting up your hair or putting on earrings, makeup, or reaching things on shelves at home?
> A:    Yes, sir.
>
> Q:    Tell me the kind of things, Catherine, you can think of that it limited your ability to do, day-to-day things, not related to pre-trip inspection of your bus?
> A:    Cleaning and sweeping.  Like sweeping, reaching up in the cabinets.  My daughter had to do my hair.  Putting on jewelry, my husband had to help.  Cooking, he did the cooking.  I couldn't lift, you know, a skillet, it pained me.
>
> . . .
>
> Q:    Anything else you can think of that it affected and limited your day-to-day?

A:     Putting on my clothes.

(Armbrester Dep. at 295-96).

These minor limitations clearly do not rise to the level of a "disability" as that term is defined by the ADA and the Rehabilitation Act. Although it "pained" Armbrester to complete some basic household chores, that diminished tolerance lasted for a very brief time.[29]  *See* 29 C.F.R. § 1630.2(i)(2).  At all times Armbrester remained capable of caring for herself, performing manual tasks, walking, seeing, hearing, speaking, breathing, and learning.  *See* 45 C.F.R. § 84.3(j)(2)(ii).

**b.     The "Major Life Activity" of Working**

According to the EEOC regulations, another "major life activity" is working.  *See* 45 C.F.R. § 84.3(j)(2)(ii).  But Armbrester is not "disabled" under that analysis, either.  In fact, it has been admitted that "[a]side from the sole act of pulling open the bus hood, Mrs. Armbrester could still perform her job by driving the school bus and working with children."  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 30).  This admission concedes that Armbrester was not, at any relevant time, disabled according to the Acts she relies on for her disability claims.  "When the major life activity under consideration is that of working," the Supreme Court has held that "the statutory phrase 'substantially limits' requires, at a minimum, that the plaintiff[] allege that [she] is unable to work in a broad class of jobs."  *Sutton v. United Air Lines,* 527 U.S. 471, 491 (1999).  The EEOC regulations specify that the "term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."  29 C.F.R. § 1630.2(j)(3)(I).  "The inability

---

[29] Although Armbrester's deposition testimony does not reveal the length of time her capacity to perform those day-to-day tasks was diminished, there is no dispute that as of October 18, 2004 she was able to return to work without restriction.  (Exh. 8 to Armbrester Dep.).

to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.*

Thus, Armbrester has never been "disabled" within the meaning of the Acts. Her claims for disability discrimination fail on that very basic level.

### 2.     The Qualified Individual and the Duty to Accommodate

Even assuming, *arguendo*, that Armbrester had established that she had a disability, she still would be unable to establish a *prima facie* case for discrimination under the ADA and the Rehabilitation Act. This is because she has not shown that she was a "qualified individual" within the meaning of the Acts.

An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide "reasonable accommodations" for the disability – unless doing so would impose undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A); *see also Lucas*, 257 F.3d at 1255. "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." *Id.* at 1255-56; *see also Earl v. Mervyn's, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) and *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997).

Armbrester requested[30] that she receive help in pulling her bus hood for mandatory pre-trip inspections. (Shirley Aff. at ¶ 5). In fact, for several weeks Shirley aided Armbrester by pulling the handle, raising the bus hood, and performing the mandatory pre-trip inspection for Armbrester. (Shirley Aff. at ¶ 5). But the Board quickly learned that such aid to a bus driver created a real safety hazard – a driver's inability to pull the hood of a bus indicates that the driver is also incapable of pulling or lifting a child to safety in an emergency situation. (Messer Aff. at ¶ 14; Shirley Aff. at ¶¶ 8, 9). Indeed, as the court noted earlier, "[t]he consequences of *failing to require* [an] employee to perform [a certain] function" in also an indicator of that function's importance, without regard to whether that function is performed on a regular basis. 29 C.F.R. Pt. 1630, App. 1630.2(n). Just as "the consequence of failing to require [a] firefighter to be able to [carry an unconscious adult out of a burning building] would be serious," 29 C.F.R. Pt. 1630, App. 1630.2(n), it would be devastating if a bus driver were incapable of pulling a child from a bus in an emergency situation. Regardless of whether a driver is regularly called upon to perform that function, it is essential to the driver's job to ensure the safety of those children riding the bus. The ability to pull a child from a bus in an emergency situation is unarguably an essential function of any bus driver's job.[31] *See* 42 U.S.C. §

---

[30] The court is providing Armbrester with a generous benefit of the doubt by stating that she did in fact request an accommodation. The evidence in the record bears out only that Armbrester presented Shirley with a doctor's note restricting her from pushing or pulling heavy objects due to neck pain. (Exh. 4 to Armbrester Dep.; Armbrester Dep. at 67, 295-96). An employee's failure to request a reasonable accommodation is fatal to the *prima facie* case; "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999); *see also Warren v. Volusia County, Florida*, 188 Fed. Appx. 859 at *863, No. 05-16411 (11th Cir. July 5, 2006).

[31] "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8).

12111(8).  Thus, even assuming that she requested such an accommodation, Armbrester would have been unable to come to the aid of children in an emergency situation.  She is therefore not a qualified individual with a disability within the meaning of the Acts and the second prong of her *prima facie* case also fails.

### 3.    Discrimination on the Basis of Disability

The third prong of the *prima facie* case requires Armbrester to come forward with some evidence that she has been discriminated against because of her disability.  Assuming, *arguendo*, that Armbrester had shown that she was disabled and qualified to perform the job of bus driver, her claim for discrimination under the ADA and the Rehabilitation Act would nevertheless fail because she has failed to show that she was discriminatorily denied aid in pulling her bus hood.[32]  As soon as the Board became aware that a driver's inability to pull her own hood was a safety hazard, a memorandum went out to *all* bus drivers that everyone would be required to pull their own hoods, and if they could not complete that task they would not be permitted to drive.  (Shirley Dep. at 15-18; Shirley Aff. at ¶ 10; Messer Aff. at ¶ 16; Messer Aff. at 14).  Thereafter, no one was allowed to drive if they were unable to pull the bus hood.  (Armbrester Dep. at 78-79; Shirley Dep. at 15-18, 22; Shirley Aff. at ¶ 10; Messer Aff. at ¶ 16; Messer Dep. at 14).  Thus, for the separate reason that

---

[32] Armbrester clearly advances only this theory of disability discrimination.  (*See* Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 31).  Although she argues that "[n]o one had ever complained or called the state director of pupil transportation, Joe Lightsey, about the younger white woman receiving this same accommodation," there is no dispute in the record that once the practice of pulling bus hoods for drivers was brought to the Board's attention, it was immediately stopped with respect to all employees.  (Shirley Dep. at 15-18; Shirley Aff. at ¶ 10; Messer Aff. at ¶ 16; Messer Dep. at 14).

Armbrester cannot show that she was discriminated against because of her disability, her *prima facie* case under the ADA and the Rehabilitation Act fails.[33]

### C.   Discrimination under the Age Discrimination in Employment Act (Count Four)

Count Four of Armbrester's complaint alleges that she has been discriminated against because of her age: "Plaintiff was in a protected class and came within coverage of the Age Discrimination in Employment Act of 1967 ('ADEA'), and, in express violation thereof, Defendant took adverse employment actions against Plaintiff." (Compl. ¶ 34).

The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age" and operates to protect those individuals who are at least 40 years old. 29 U.S.C. § 623(a)(1). The legal standards developed in Title VII cases apply equally to ADEA cases. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1269 (11th Cir. 2001). Thus, a plaintiff may establish a *prima facie* case of age discrimination in one of three ways: (1) with direct evidence; (2) with circumstantial evidence; or (3) with statistical evidence. *See Corbin v. Southland Int'l Trucks*, 25 F.3d 1545, 1548 (11th Cir. 1994).

Although Armbrester believes that she has proven her age discrimination case with direct evidence because "an employee in a supervisory position made comments regarding Mrs. Armbrester's age to harass her" and "other employees would tell Mrs. Armbrester she needed to retire" (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 28), those comments do not rise to the level of direct evidence. The Eleventh Circuit "has marked severe limits for the kind of language

---

[33] Assuming one step further that Armbrester had established a *prima facie* case of disability discrimination, she has completely failed to show that the Board's articulated legitimate, non-discriminatory reasons operate as a pretext for discrimination. *See* Section IV.A.2.b, *supra*.

to be treated as direct evidence of discrimination." *Jones v. Bessemer Carraway Medical Ctr.*, 151

F.3d 1321, 1323 n.11 (11th Cir. 1998)(holding that comment by decision maker "You black girls

make me sick, sometimes I feel like just hitting you in the head" was not direct evidence of the

alleged adverse employment actions); *see also Damon v. Fleming Supermarkets of Fla., Inc.*, 196

F.3d 1354, 1359 (11th Cir.1999) (decision-maker's comment that "the company needed . . . young

men . . . to be promoted" did not constitute direct evidence of age discrimination).  Direct evidence

of discrimination can only be "evidence, that, if believed, proves [the] existence of [a] fact without

inference or presumption."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir.2004)

(citing *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir.1997)); *accord*

*Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1081 (11th Cir.2005); *Beaver v. Rayonier, Inc.*, 200

F.3d 723, 730 (11th Cir.1999); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir.1997).[34]

---

[34] In the recent unpublished case of *Kilpatrick v. Tyson Foods, Inc.*, No. 07-13782-AA, 2008 WL 624032 (11th Cir. March 10, 2008), the Eleventh Circuit addressed the standard applicable to direct evidence in employment cases.  The court held:

> [Plaintiff] argues that the district court erred in applying this well-established definition of direct evidence- "evidence, which if believed, proves existence of fact in issue without inference or presumption"- because it conflicts with this Court's case law. We disagree. Specifically, he cites Judge Tjoflat's opinion in *Wright v. Southland Corp.*, 187 F.3d 1287, 1293 (11th Cir.1999), which said that "direct evidence, in the context of employment discrimination law, means evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic." However, neither of the other two members of the panel joined in Judge Tjoflat's opinion, agreeing only that the evidence there was sufficient to create a genuine issue of material fact. *See id.* at 1306 (Cox, J., concurring in result only); *id.* (Hull, J., concurring in result only). Moreover, our case law, both before and since *Wright*, has used the standard applied by the district court in this case- i.e., that direct evidence in this context means "evidence, which if believed, proves existence of fact in issue without inference or presumption."

*Kilpatrick*, 2008 WL 624032, at *2.

Indeed, "only the most blatant remarks, whose intent could be nothing other than to discriminate" constitute direct evidence. *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999).

In light of this strict standard, Plaintiff's purported direct evidence of discrimination – that Cochran would "talk about [how] I needed to carry my old gray self home and sit down" (Armbrester Dep. at 38) and that "other employees would tell Mrs. Armbrester she needed to retire" (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 28) – cannot carry the day. Those statements neither mention nor allude to the adverse actions alleged in this case, and there is no evidence those comments were in any way connected with the Board's decision to recommend Armbrester's suspension and/or termination. Such isolated comments, made without any nexus to the relevant issues, are not direct evidence. *Standard v. A.B.E.L., Inc.*, 161 F.3d 1318, 1329 (11th Cir. 1998) ("[R]emarks . . . unrelated to the decisionmaking process itself are not direct evidence of discrimination."). Moreover, the statements do not reflect a clear intent to discriminate based on age and can certainly be interpreted in more than one way. This Circuit has made clear that evidence that is subject to more than one interpretation, *Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1083 n. 2 (11th Cir.1996), or "devoid of any meaningful context," *A.B.E.L.*, 161 F.3d at 1329, cannot constitute direct evidence. At most, the court envisions that the comments should be analyzed to see if they constitute circumstantial evidence of age discrimination. (*See* n. 38, *infra*).

A theory of circumstantial age discrimination invokes the burden shifting framework established by the Supreme Court in *McDonnell Douglas*. 411 U.S. at 792; *see also Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1267 n.6 (11th Cir. 2001) (noting that "[a]lthough the *McDonnell Douglas* framework originally applied to Title VII cases, it is now widely accepted that the

---

framework applies to claims of discrimination under the ADEA as well.").  In order to establish a *prima facie* case of age discrimination, Armbrester must show that: (1) she was a member of a protected group of persons over the age of 40; (2) she was subjected to an adverse employment action; (3) she was qualified to perform the job; and (4) similarly-situated younger employees were treated more favorably.  *See Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998).

Armbrester is sixty-one (61) years of age and has been performing the job of bus driver for the Board for approximately twenty years.  (Exh. 25 to Armbrester Dep.).  She has therefore established the first and third elements of the *prima facie* case of age discrimination.  But that is the extent of her success in establishing a *prima facie* case.

### 1.    The Allegedly Adverse Employment Actions

Armbrester's evidence of adversity on the basis of age is the same as was alleged "in [the] previous race discrimination argument."  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 28).  As such, it is premised on: (1) her assignment to the Tri-Systems bus route; (2) the Board's refusal to "accommodate" her "disability;" (3) the recommendation that her employment be temporarily suspended; and (4) the recommendation that her employment be terminated.  But, for the reasons already discussed, these claims do not support Armbrester's claim for discrimination under Title VII[35] and they necessarily fail in an ADEA analysis.  *See Cofield*, 267 F.3d at 1267 n.6.

### 2.    The Alleged Comparators

Even assuming, *arguendo*, that Armbrester could establish that the complained-of actions were adverse, her *prima facie* case of disability discrimination would nevertheless fail because she

---

[35] *See* Section IV.A.2.a.i, *supra*.

45

has not presented *any* evidence of comparators.[36]  Her brief asserts that she "is the oldest bus driver working for the Defendant" but does nothing to establish that similarly-situated younger drivers were treated more favorably.  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 27).  Even attributing the comparator argument Armbrester made in the Title VII realm does not help Armbrester.[37]  *See Cofield*, 267 F.3d at 1267 n.6.

Once again, even assuming, *arguendo*, that Armbrester has established a *prima facie* case of age discrimination, her claim nevertheless fails because she cannot show that the Board's articulated legitimate nondiscriminatory reasons for at least three of the allegedly adverse acts were a pretext for discrimination.  As thoroughly discussed in Section IV.A.2, *supra*, not only does Armbrester clearly fail to refute all of the Board's numerous articulated reasons, but the "evidence of pretext" that she does present does nothing more than quibble with the reasons given by the Board

---

[36] *See* footnote 23, *supra*.

[37] *See* Section IV.A.2.a.ii, *supra*.

46

and certainly does nothing to establish that she has been discriminated against because of her age.[38]

For this separate reason, Armbrester's claim of age discrimination fails.

    **D.**    **Retaliation under Title VII, 42 U.S.C. § 1981, the Americans with Disabilities Act and the Age Discrimination in Employment Act (Count Six)**

Count Six of the Complaint alleges that the Board "intentionally and wrongfully retaliated against Plaintiff for her prior complaints of discrimination and other protected activity in violation of Title VII, § 1981, the ADA, and the ADEA." (Compl. ¶ 41). Title VII, the ADA, and the ADEA

---

[38] The court can envision an argument, not presented by Armbrester in her brief, that Cochran's comment that she "needed to carry [her] old gray self home and sit down" could be considered pretext evidence of an intent to discriminate based on age. But Cochran's involvement in the allegedly adverse employment actions was limited at best. Indeed, the grounds upon which Messer relied in recommending Armbrester's suspension were numerous: (1) driving at a high rate of speed; (2) harassing employees by taking pictures of them; (3) picking up children an hour and a half early from school for personal reasons and failing to obtain approval from a supervisor before doing so; (4) poor judgment in failing to pick up children who were stranded on the side of the road in the rain while their school bus was in need of repair; and (5) other good and just cause. (Exh. 11 to Armbrester Dep.; Messer Aff. at ¶ 24). Only two of those grounds – driving at a high rate of speed and the failure to pick up stranded children – stem from complaints lodged by Cochran. (Exhs. 1, 9, 10 to Armbrester Dep.). Cochran had even a lesser role with respect to the decision to discharge Armbrester. Although the grounds previously outlined by Cochran during the suspension proceedings remained a concern for Messer, the overwhelming factor leading to the proposed recommendation of termination was Messer's concern that "a child [would be] seriously injured due to Ms. Armbrester's lack of judgment." (Messer Aff. at ¶ 29.)

This is not a situation where Messer served as a mere conduit, or "cat's paw," for Cochran's discriminatory animus. *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999)("[C]ausation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee. In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus."). Even assuming Cochran's "old gray self" comment reveals a discriminatory bias against Armbrester on the basis of her age, and even assuming Cochran's complaints were borne out of that discriminatory animus, Messer's recommendation to the Board was based on far more than just Cochran's input. Such a tenuous connection between Cochran's comment and the alleged adverse decisions, without more, is insufficient to establish pretext. *See Chapman*, 229 F.3d at 1024-25 (holding that where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.)

each prohibit an employer from discriminating against any individual for participation in or opposition to unlawful employment practices. *See* 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 12203; and 29 U.S.C. § 623(d). To establish a *prima facie* case of retaliation, Armbrester must show: (1) that she engaged in protected activity or expression; (2) that she suffered an adverse employment action; and (3) that the adverse employment action was causally connected to the protected conduct.[39] *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998); *see also Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989). If Armbrester is able to advance a *prima facie* case of retaliation, the burden then shifts in accordance with *McDonnell Douglas* to the Board to articulate legitimate, non-discriminatory reasons for the alleged retaliatory acts. *See Phillips v. Aaron Rents, Inc.*, Slip Copy, 2008 WL 111038, No. 07-11477 at *8 (11th Cir. Jan. 11, 2008) ("Retaliation claims are also analyzed under the *McDonnell Douglas* burden-shifting framework.") (citing *Holifield*, 115 F.3d at 1566). Once her employer articulates such a reason, Armbrester must demonstrate that the Board's proffered explanation is a pretext for retaliation in order for her claim to survive summary judgment. *See id.*

---

[39] In *Adams v. Cobb County Sch. Dist.*, the Eleventh Circuit noted that "'whether the elements of Title VII and § 1981 retaliation claims are the same is an open question in this Circuit.'" 2007 WL 1720430, No. 06-15103 at *4 n.6 (11th Cir. June 15, 2007) (quoting *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1120 n. 10 (11th Cir. 2001)). As in *Adams*, however, because the parties have not raised this "open question," the court assumes without deciding that the elements of a Title VII retaliation claim also apply to a § 1981 retaliation claim. *See Blackledge v. Ala. Dep't of Mental Health & Mental Retardation*, 2007 WL 3124452, No. 2:06-cv-321 at *7 (M.D. Ala. Oct. 25, 2007).

### 1.    The Statutorily Protected Expression Element of the *Prima Facie* Case

Armbrester alleges that she engaged in statutorily protected expression eight times.[40]  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 32-33).  To recover for retaliation, Armbrester does not need to show that she made a "formal" protest; informal complaints to superiors about unlawful discrimination are clearly within the scope of statutorily protected conduct.  *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989).  A plaintiff, however, must show that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices."  *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002).

Armbrester clearly engaged in statutorily protected activity when she filed charges of discrimination with the EEOC on May 5, 1997, October 12, 2004, October 13, 2005, and October 27, 2005.  (Exhs. 24, 25, 43, and 44 to Armbrester Dep.).  Although Armbrester's testimony regarding her grievances about Cochran's comment and her preferred bus route is unclear, the court assumes, without deciding, that those grievances also constitute statutorily protected expression, as do her successful attempts to overturn her recommended suspension and termination.  (Armbrester Dep. at 35-39).

---

[40] The eight instances of claimed protected conduct are: (1) Armbrester's May 5, 1997 charge of discrimination; (2) Armbrester's October 2004 grievance against Cochran for making the "old gray self" comment; (3) Armbrester's grievance regarding her bus route; (4) Armbrester's October 12, 2004 charge of discrimination; (5) Armbrester's challenge of the suspension recommendation on January 25, 2005; (6) Armbrester's October 13, 2005 charge of discrimination; (7) Armbrester's October 27, 2005 charge of discrimination; and (8) Armbrester's challenge of the termination recommendation on April 6-7, 2006.  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 32-33).

### 2. The Adverse Employment Action Element of the *Prima Facie* Case

The Supreme Court has recently provided some guidance on the level of materiality required for a plaintiff to establish the second element of the retaliation *prima facie* case. In *Burlington Northern & Santa Fe R.R. Co. v. White*, the Court concluded that "the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." 126 S. Ct. 2405, 2409 (2006); *see also Bush v. Regis Corp.*, 2007 WL 4230693, No. 07-12690 at *2 (11th Cir. Dec. 3, 2007); *Taylor v. Roche*. 196 Fed. Appx. 799, 802 (11th Cir. Sept. 12, 2006). That is, the anti-retaliation provision protects an individual not from all retribution, but from retaliation that produces injury or harm. *See Rutledge v. Sun Trust Bank*, 2008 WL 161796, No. 07-12419 at *2 (11th Cir. Jan. 18, 2008) (citing *Burlington*, 126 S. Ct. at 2414). The inquiry is individualized because the significance of any given act of retaliation will often depend on the particular circumstances. *See Taylor*, 196 Fed. Appx. at 802 (citing *Burlington,* 126 S. Ct. at 2415). But the acts must nevertheless be material and significant, not merely trivial. *See Rutledge*, 2008 WL 161796 at *2 (citing *Burlington*, 126 S. Ct. at 2415). The retaliation clause does not immunize an employee from those petty slights or minor annoyances that often take place at work and that all employees experience. *See Burlington*, 126 S. Ct. at 2415.

Armbrester contends that four actions by the Board, "as previously discussed,"[41] constitute materially adverse employment actions. (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 33). Those four allegations are: (1) Armbrester's assignment to the Tri-Systems bus route; (2) the Board's "refus[al] to reasonably accommodate Mrs. Armbrester for her disability" by lifting her bus hood so that she could perform mandatory pre-trip inspections; (3) the recommendation of the suspension of Armbrester's employment; and (4) the recommendation of the termination of Armbrester's employment. The potential adversity of each of these actions will be considered in turn.

### a.   The Tri-Systems Assignment

Beginning in August 2004, Shirley assigned Armbrester to the Tri-Systems bus route for the 2004 to 2005 school year. (Shirley Aff. at ¶ 4; Armbrester Dep. at 33). Armbrester was unhappy with the assignment and believed that "they gave the white driver [Tracy Bentley] a better route than they gave me." (Armbrester Dep. at 31). Armbrester alleges that the Tri-Systems bus route was undesirable because "the students had presumably been expelled for behavioral problems, and were less desirable as bus riders than students attending ordinary schools." (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 23). However, there is no evidence in the record to support the bald assertion that the children on the Tri-Systems route experienced behavioral problems. In fact, the only evidence in the record establishes that student behavioral problems existed on the Tri-Systems route as well as the non-Tri-Systems routes. (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J.

---

[41] The crux of Plaintiff's argument is that the recommended suspension constituted an adverse action as required to state a claim for retaliation. (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 33-36). However, because the Response (Doc. # 39) does allude to the other three allegedly adverse actions as retaliatory, the court will consider those herein as well.

at 23-24).  Armbrester herself testified that there were benefits to the Tri-Systems route – fewer children, less stops.  (Armbrester Dep. at 33-37).  And the Board considered the Tri-Systems route to be the "best" because it was compensated at a higher rate and involved fewer students and fewer stops.  (Shirley Aff. at ¶ 4).

Because no injury or harm resulted from the assignment to the Tri-Systems route, a reasonable employee could not find assignment to Tri-Systems "materially adverse."  *See Burlington*, 126 S. Ct. at 2409; *see also Byrd v. Auburn Univ. Montgomery*, 2008 WL 624025, No. 07-12335 at *1 (11th Cir. March 10, 2008).  The assignment slighted and annoyed Armbrester, but did nothing more.  *Burlington*, 126 S. Ct. at 2415.  It therefore does not rise to the level of materiality required to state a *prima facie* case of retaliation under *Burlington*.

### b.      The Requirement that Bus Drivers be Physically Able to Pull the Bus Hoods

On September 30, 2004, Shirley informed all bus drivers that they would be required to pull their own bus hoods, and if they could not complete that task they would not be permitted to drive.  (Shirley Dep. at 15-18; Shirley Aff. at ¶ 10; Messer Aff. at ¶ 16; Messer Dep. at 14).  As Armbrester had presented the Board with a doctor's note in August or September 2004 restricting her from pulling or pushing heavy objects due to neck pain, she was unable to work for about a week in October  and was placed on *paid* sick leave.   (Messer Aff. at ¶ 20; Exh. C to Messer Dep.).  Armbrester now contends that the Board's failure to "accommodate" her "disability" constitutes an adverse employment action under *Burlington*.

Not only did no harm or injury befall Armbrester because of this alleged adverse employment action, *see Byrd*, 2008 WL 624025 at *1, but the action obviously did not dissuade her from filing

and supporting a charge of discrimination with the EEOC. *See Burlington*, 126 S. Ct. at 2409; *see also McCann*, 2006 WL 1867486 at *9-10 ("In making [the] determination [of whether the action might have dissuaded a reasonable worker from making or supporting a charge of discrimination], context matters, requiring a review of plaintiff-specific circumstances.") (internal citations omitted). Just thirteen days after receiving notice that all employees would be required to pull their own bus hoods and just one day after receiving a notice from Messer that she would need an updated note from her doctor before she could come back to work, Armbrester filed charge number 130-2005-00156 with the EEOC alleging discrimination on the basis of race, age, and disability, as well as retaliation. (Exh. 24 to Armbrester Dep.). Thus, the Board's insistence that Armbrester not drive until she was physically able to lift the bus hood does not rise to the level of adversity required to establish a *prima facie* case of retaliation under *Burlington*.

### c.       The Recommended Suspension

On January 4, 2005, Messer informed Armbrester that he would recommend to the Board that she be suspended for a period of five days without pay. (Exh. 11 to Armbrester Dep.). Grounds for that recommendation were: (1) driving at a high rate of speed; (2) harassing employees by taking pictures of them; (3) picking up children an hour and a half early from school for personal reasons and failure to obtain approval to do so; and (4) poor judgment in failing to pick up children who were stranded on the side of the road in the rain while their school bus was in need of repair. (Exh. 11 to Armbrester Dep.; Messer Aff. at ¶ 24). Armbrester contested the recommendation at the January 27, 2005 school board hearing, and the recommendation was *overturned*. (Exh. 1 to Armbrester Dep.; Messer Aff. at ¶ 25).

Once again, not only did no injury or harm befall Armbrester because the proposed suspension did not occur, *see Byrd*, 2008 WL 624025 at *1, the allegedly adverse action certainly did not dissuade Armbrester from filing a charge of discrimination with the Board. *See Burlington*, 126 S. Ct. at 2409; *see also McCann v. Mobile County Personnel Bd.*, 2006 WL 1867486, No. 05-0364 at *17 n.18 (S.D. Ala. July 6, 2006) ("The Supreme Court presumably used 'charge' in the broad sense of an accusation, rather than in the narrow sense of a formal charge of discrimination with the EEOC, since the facts in [*Burlington*] involved only an internal complaint."). Just twenty-three days after learning that Messer would recommend suspension, Armbrester successfully challenged that recommendation at the school board hearing. (Exh. 1 to Armbrester Dep.). Thus, the Board's recommendation that Armbrester's employment be terminated does not rise to the level of adversity required to establish a *prima facie* case of retaliation under *Burlington*.

### d.      The Recommended Termination

On September 15, 2005, Messer informed Armbrester that he would recommend to the Board that her employment be terminated. (Messer Aff. at ¶ 31; Exh. D to Messer Aff.). The Board voted to terminate Armbrester's employment on October 10, 2005 and Armbrester was made aware of that decision on the following day. (Messer Aff. at ¶ 32; Exh. E to Messer Aff.). Then, on October 13, 2005, just twenty-eight days after receiving notice that the recommendation would be made, and just three days after that recommendation was approved, Armbrester filed charge number 130-2005-05355 with the EEOC, alleging retaliation. (Exh. 43 to Armbrester Dep.). On October 27, 2005, seventeen days after the recommendation was approved, Armbrester filed charge number 130-2006-00371 with the EEOC, alleging that her discharge was retaliation for previously filed charges of discrimination. (Exh. 44 to Armbrester Dep.).

54

Not only did no harm or injury befall Armbrester because the recommended termination was overturned, *see Byrd*, 2008 WL 624025 at *1, the allegedly adverse action certainly did not dissuade Armbrester from filing and supporting charges of discrimination with the EEOC.  *See Burlington*, 126 S. Ct. at 2409; *see also McCann*, 2006 WL 1867486 at *9-10 ("In making [the] determination [of whether the action might have dissuaded a reasonable worker from making or supporting a charge of discrimination], context matters, requiring a review of plaintiff-specific circumstances.") (internal citations omitted).  Thus, the Board's recommendation that Armbrester's employment be terminated does not rise to the level of adversity required to establish a *prima facie* case of retaliation under *Burlington*.

Because none of the Board's actions rise to the required level of adversity, Armbrester's claims of retaliation necessarily fail.

### 3.    The Causal Connection Element of the *Prima Facie* Case

Even if Armbrester's allegations of adversity rose to the level required in a retaliation action (and they do not), Armbrester has not adduced sufficient evidence to show that the "adverse" actions were causally related to her protected activity.  "In order to establish the requisite 'causal link' required as part of a *prima facie* case, a plaintiff need only establish that 'the protected activity and the adverse action were not wholly unrelated.'" *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *see also Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).  But a substantial delay between the protected activity and the negative employment action, where there is no other evidence of causation, is insufficient to establish a causal connection.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).

55

Armbrester alleges that she engaged in protected activity eight times and that there is a causal connection between those protected acts and the four[42] allegedly "adverse" employment decisions. (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 32-33, 36-37).  But there are *no* allegedly adverse employment decisions even close to four of the protected acts.[43]  And there is no causal connection between the early October 2004 acts and the January 4, 2005 recommendation that Armbrester's employment be suspended.  (Armbrester Dep. at 38; Exhs. 1, 24 to Armbrester Dep.). This nearly three month delay, without more, does not support a claim of retaliation.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361 (11th Cir. 2007) ("In opposing summary judgment, [plaintiff] failed to present evidence from which a reasonable jury could find any causal connection between her . . . complaints of sexual harassment and the termination of her employment three (3) months later.").  Likewise, no causal connection exists between the October 2004 and January 2005 protected acts and the recommendation that Armbrester be terminated in September 2005.  (Exhs. 1, 24 to Armbrester Dep.; Armbrester Dep. at 38; Exh. D to Messer Aff.).  The proposed termination occurred eleven months and eight months, respectively, after Armbrester engaged in the protected activity.  Such a delay is obviously too attenuated to support a claim for retaliation.  *See Higdon v. Jackson*, 393 F.2d 1211, 1220 (11th Cir. 2004) (noting that the Supreme Court cited with approval

---

[42] Once again, for clarity, the court outlines the four acts which Armbrester contends were adverse: (1) her assignment to the Tri-Systems bus route in August 2004; (2) the Board's refusal to "accommodate" her "disability" in September 2004; (3) the recommendation that her employment be temporarily suspended in January 2005; and (4) the recommendation that her employment be terminated in September 2005.  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 28).

[43] The May 5, 1997 EEOC charge was filed at least seven years before any allegedly adverse employment action occurred.  (Exh. 25 to Armbrester Dep.; Armbrester Dep. at 33).  The October 13, 2005 EEOC charge, the October 27, 2005 EEOC charge, and the April 6-7, 2006 challenge to the termination all occurred *after* any allegedly adverse employment action.  (Exhs. 43, 44 to Armbrester Dep.; Exh. F to Messer Aff.).

cases stating that a three to four month delay between the activity and the adverse action was insufficient to find a causal connection).  That leaves Armbrester's grievance regarding her bus route.  (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. at 32).  But there is no evidence in the record to establish *when* this complaint was made (Armbrester Dep. at 35-37); therefore, Armbrester has failed to show a causal connection between it and any allegedly adverse employment action.

Because Armbrester has failed to establish a causal connection between her protected activities and the allegedly adverse actions of the Board, her claims of retaliation necessarily fail.

### 4.    Armbrester's Failure to Rebut the Board's Articulated Legitimate Nondiscriminatory Reasons for the Alleged Retaliation is Fatal to her Claims of Retaliation

Once again, even assuming, *arguendo*, that Armbrester has established a *prima facie* case of retaliation, her claim nevertheless fails because she cannot show that the Board's articulated legitimate nondiscriminatory reasons for at least three of the allegedly adverse acts were a pretext for retaliation.  As thoroughly discussed in Section IV.A.b, *supra*, not only does Armbrester clearly fail to refute all of the Board's numerous articulated reasons, but the "evidence of pretext" that she does present does nothing more than quibble with the reasons given by the Board.  For this separate reason, her claims of retaliation fail.

## V.    <u>Conclusion</u>

For the reasons asserted above, there being no dispute as to any material fact, Defendant Talladega City Board of Education's Motion (Doc. # 34) for Summary Judgment is due to be granted.  A separate order will be entered dismissing all claims.

**DONE** and **ORDERED** this _____26th_____ day of March, 2008.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE